J-S41028-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: C.A.T., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 492 MDA 2019 |

Appeal from the Order Entered February 13, 2019
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  2018-00046

BEFORE:   LAZARUS, J., MURRAY, J., and STRASSBURGER*, J.

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 30, 2019**

K.C. (Mother) appeals from the order involuntarily terminating her parental rights to her daughter, C.A.T. (born August 2014) (Child), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).[1]  After careful review, we affirm.

The record reveals that Lackawanna County Office of Youth and Family Services (OYFS) became involved with Mother and her two older children in 2011.  N.T., 11/5/18, at 9.  Prior to Child's birth, Mother agreed to the voluntary termination of her parental rights with respect to the two older children.  *Id.* at 25.  OYFS became involved with Child in September 2014, when Child was one month old.  *Id.* at 26.  At that time, police found Child in

_____

[1] By order entered November 9, 2018, the court involuntarily terminated the parental rights of Child's father, C.T. (Father).  Father has not appealed the termination of his parental rights and is not a party to the instant appeal.

_____

* Retired Senior Judge assigned to the Superior Court.

the care of an eight-year-old. *Id.* at 26-27. As a result, Mother was charged with endangering the welfare of a child. *Id.* at 27-28. Child was subsequently adjudicated dependent and placed in foster care until March 2016, when Mother regained custody of Child. N.T., 11/19/18, at 10-12, 85. During the course of the dependency, Mother married R.S. and became pregnant, subsequently giving birth to R.C. *Id.* at 10-13. Child's dependency terminated in June 2016. *Id.* at 12.

In July 2016, while married to R.S., Mother rekindled her relationship with Father. *Id.* at 12-13. As a result, R.S. left the home. *Id.* In November 2016, OYFS received a report that Mother, then 28 years old, was dating a minor, B.S., the nephew of R.S. *Id.* at 13-14, 22. Further, B.S. cared for Child and R.C. while Mother worked 10 to 12 hours a day. *Id.* at 14. OYFS encouraged Mother to seek more reliable daycare. *Id.* at 14-15.

In May 2017, OYFS received a referral for suspected child abuse when Mother brought seven-month-old R.C. to Moses Taylor Hospital with a black eye and a hematoma. *Id.* at 58-64. Mother reported that Child injured R.C. when Child threw a toy at him. *Id.* at 59. A full skeletal scan revealed that R.C. had two skull fractures and a rib fracture. *Id.* at 62-63. Because R.C.'s injuries were inconsistent with Mother's explanation, both Child and R.C. were removed from her care. *Id.* at 59-61.

On October 12, 2017, Child was adjudicated dependent once again. OYFS developed a service plan for Mother that required Mother to engage in mental health services; obtain a parenting assessment; and participate in

visitation with Child. *Id.* at 87. In November 2017, Mother's service plan was modified to include participation in a parenting group. *Id.* Mother attended her appointments sporadically and was unsuccessfully discharged from a parenting program. *Id.* at 89-90. Moreover, Mother's visits never progressed for any appreciable period of time. *Id.* at 130-34.

On August 3, 2018, OYFS filed a petition to involuntarily terminate Mother's parental rights to Child. The court conducted an evidentiary hearing on November 5, 2018 and November 19, 2018. OYFS presented the testimony of Cristin Wormuth, an OYFS supervisor; Jennifer Dunston and Marissa Lynady, caseworkers for OYFS; Erik Krauser, an intake caseworker for OYFS; and Stephanie Herne, an OYFS family engagement caseworker and visitation supervisor. Mother testified on her own behalf and presented the testimony of B.S.[2]

---

[2] At the time of the hearing, Child had a guardian *ad litem*, Attorney Kevin O'Hara. Attorney O'Hara stated, "I do not believe that I have a conflict of interest representing the child. . . ." N.T., 11/19/18, at 221. *See In re Adoption of L.B.M.*, 161 A.3d 172, 174-75, 180 (Pa. 2017) (plurality) (stating that, pursuant to 23 Pa.C.S.A. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome); *see also In re T.S.*, 192 A.3d 1080, 1089-90, 1092-93 (Pa. 2018) (finding the preferred outcome of a child who is too young or non-communicative unascertainable in holding a child's statutory right to counsel not waivable and reaffirming the ability of an attorney-GAL to serve a dual role and represent a child's non-conflicting best interests and legal interests).

On February 13, 2019, the court entered an order involuntarily terminating Mother's parental rights. On March 18, 2019, Mother filed her notice of appeal and concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

On appeal, Mother raises the following issues for review:

1. The [c]ourt erroneously allowed this matter to proceed to a full hearing as the petition for termination of parental rights was fatally defective pursuant to 23 Pa.C.S.A. [§] 2512. The petition in this case made no mention of the "conditions" on which the termination was based. As such it was unclear and remains unclear as to what "conditions" the agency believes necessitated

_____

[3] Generally, an appeal must be filed within 30 days after entry of the order from which the appeal is taken. Pa.R.A.P. 903(a). An untimely appeal divests this Court of jurisdiction. *Valley Forge Center Associates v. Rib-It/K.P., Inc.*, 693 A.2d 242, 245 (Pa. Super. 1997). However, "[e]ven when a party has filed an untimely notice of appeal, . . . appellate courts may grant a party equitable relief in the form of an appeal *nunc pro tunc* in certain extraordinary circumstances." *Criss v. Wise*, 781 A.2d 1156, 1159 (Pa. 2001). Such extraordinary circumstances include situations where "a party failed to file a timely notice of appeal as a result of fraud or a breakdown in the court's operations." *Rothstein v. Polysciences, Inc.*, 853 A.2d 1072, 1075 (Pa. Super. 2004) ("Cases involving a breakdown in court operations often involve a failure on the part of the prothonotary to fulfill his or her ministerial duties, such as the filing of dispositions and other relevant information on the appropriate docket, or giving notice of these dispositions to interested parties[.]"). Here, it is apparent that such a breakdown occurred. On May 22, 2019, this Court issued an order directing Mother to show cause why her appeal should not be quashed as untimely. In response, Mother asserted that the February 13, 2019 order was not served upon Mother or her counsel, and that Mother did not learn of the order until March 7, 2019. Answer in Response to Rule to Show Cause at 1. Mother argued that the order was sent to counsel at an address in Scranton, Pennsylvania, despite the fact that counsel "does not and has never had an office in Scranton." *Id.* As it is apparent from the certified record that the prothonotary served counsel at the wrong address, we conclude that Mother is entitled to appeal *nunc pro tunc*.

placement or termination. The [c]ourt should have denied the petition without prejudice as being fatally defective.

2. The [c]ourt erroneously terminated [Mother's] parental rights in that [Mother] did not cause injury to [Child] or [Child's] sibling and there is no indication that an injury, such as the injury to [Child's] sibling might reoccur. Accordingly, the conditions that led to placement no longer exist and the [c]ourt did not have a valid basis for finding for termination pursuant to 23 Pa.C.S.A. [§] 2511(a)(2), (5) or (8).

3. The [c]ourt erroneously terminated [Mother's] parental rights without fully considering the best interests of [Child] pursuant to Pa.C.S.A. [§] 2511(b). Part of that best interest analysis in this context is a review of the effect of breaking the bond between parent and child. All evidence presented suggested a strong bond between [Mother] and child and no evidence was presented to suggest how the termination of that bond might effect [C]hild. Accordingly, there was not sufficient evidence to terminate [Mother's] parental rights[.]

Mother's Brief at 4-5 (reordered for ease of disposition).[4]

In her first issue, Mother argues that the petition for involuntary termination filed by OYFS failed to contain supporting facts. Mother's Brief at 21-22. Mother asserts the petition provides only demographic information and a recitation of the statutory sections asserted by OYFS without supporting facts. *Id.* at 22-23. Mother contends that she would have received more information had she received a parking ticket, and that the court should have dismissed OYFS's petition. *Id.* at 22-25.

---

[4] In the argument section of her brief, Mother combines the first and second issues. We address them separately.

Prior to the start of the termination hearing, Mother's counsel made an oral motion to dismiss OYFS's petition based on the lack of factual assertions contained in the petition. N.T., 11/5/18, at 5. The court denied Mother's motion, stating:

> [Y]ou have been present for almost all, if not all, of the hearings, so at that point in time you heard the testimony and the court made reference to the findings of fact as to the testimony that was presented in those hearings, so both you and your client should understand exactly why and how and under what facts the agency is following through with this, so motion denied.

*Id.* at 7.

Initially, we observe "the Rules of Civil Procedure do not recognize a Motion to Dismiss as a separate motion . . ." *Long v. Ostroff*, 854 A.2d 524, 527 (Pa. Super. 2004). On occasion, we have treated motions to dismiss as equivalent to a motion for summary judgment. *See id.* Here, however, Mother's argument is directed at the failure of OYFS to include sufficient facts in its petition. Accordingly, Mother's motion to dismiss is more akin to preliminary objections. *See* Pa.O.C.R. 3.9(b)(2), (3) (permitting a party to file preliminary objections asserting the failure of a pleading to conform to law or rule of court or insufficient specificity in a pleading). "This Court will reverse the trial court's decision regarding preliminary objections only where there has been an error of law or an abuse of discretion." *Mendel v. Williams*, 53 A.3d 810, 816–817 (Pa. Super. 2012).

- 6 -

The content of a petition to involuntarily terminate parental rights is governed by 23 Pa.C.S.A. § 2512 and Pa.O.C.R. 15.4. Pursuant to Section 2512:

> (b) Contents.--The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights. The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted. If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated nor that a person with a present intention to adopt exists.

23 Pa.C.S.A. § 2512(b).

Moreover, Rule 15.4 provides, in pertinent part:

> (a) Petition. A petition for involuntary termination of parental rights under Sections 311 and 312 of the Adoption Act shall include the following allegations:
>
> * * *
>
> (6) facts constituting grounds for the involuntary termination under Section 311 of the Adoption Act, and a reference to the applicable subsection or subsections;
>
> ***

Pa.O.C.R. 15.4(a)(6).

Here, OYFS's petition included the assertion that Child has been in its care since May 19, 2017, was adjudicated dependent on October 12, 2017, and specifically referenced Child's juvenile court docket number. Petition for Involuntary Termination at ¶ 2. It would have been advisable for OYFS to plead additional facts or explicitly incorporate by reference the juvenile court record to establish the facts supporting the termination petition. However, we

discern no prejudice to Mother, as she was aware of OYFS's concerns throughout Child's dependency. Pursuant to Pa.O.C.R. 1.2(a), the orphans' court rules "shall be liberally construed to secure the just, timely and efficient determination of every action or proceeding to which they are applicable. The court at every stage of any action or proceeding may disregard any error or defect of procedure that does not affect the substantive rights to the parties in interest." Upon review, we conclude that the orphans' court did not abuse its discretion by denying Mother's motion to dismiss. Accordingly, Mother's first issue does not merit relief.

With respect to Mother's substantive arguments, we review cases involving the termination of parental rights according to the following standards:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (internal citations and quotations omitted).

Termination requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

While the orphans' court in this case determined that OYFS met its burden of proof under 23 Pa.C.S.A. § 2511(a)(2), (5), and (8), as well as (b), we need only agree with its decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Thus, we focus our analysis on Section 2511(a)(2) and (b), which provides:

**(a)** **General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

***

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

***

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental,

- 9 -

physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of Section 2511(a)(2), the moving party must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *See In Interest of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties. *Id.*

Mother argues that the orphans' court improperly terminated her parental rights pursuant to Section 2511(a)(2) because there was insufficient evidence to support its conclusion that Mother lacks the capacity to appropriately parent Child. Mother's Brief at 25-28. Mother contends there is no evidence that she caused or had knowledge of the cause of R.C.'s injury. *Id.* at 25-26. She further asserts that she is addressing mental health issues, and has no current issues with domestic violence or parenting. *Id.* at 26-28.

- 10 -

Additionally, she claims that OYFS presented insufficient evidence of any problems with Mother's decision-making. *Id.* at 28.

Conversely, the orphans' court summarized its conclusions with respect to Section 2511(a)(2) as follows:

> In satisfaction of the elements required to find termination appropriate pursuant to 23 Pa.C.S.A. § 2511(a)(2): (1) Mother repeatedly and continuously demonstrated that she refuses or lacks the capacity to protect her children from violent, tumultuous or inappropriate circumstances; (2) Mother's refusal or incapacity caused minor child to be without essential parental care, control or subsistence necessary for her well-being; and (3) the causes of Mother's failings cannot or will not be remedied as evidenced by her extensive history with [OYFS], sporadic engagement in services, and cyclical irresponsible conduct. In fact, though her actions clearly suggest the same, Mother testified that the services [OYFS] prescribed have not positively affected her decision-making capabilities. This [c]ourt finds no question that Mother "has demonstrated a continued inability to conduct [her] ... life in a fashion that would provide a safe environment for a child... and [that her] behavior is irremediable as supported by clear and competent evidence." *In re Z.P.*, 994 A.2d at 1118 (quoting, *In re Adoption of Michael S.C.* 486 A.2d at 375). The [c]ourt is, therefore, satisfied that [OYFS] met its burden with respect to its first ground alleged for termination of Mother's parental rights.

Orphans' Court Opinion, 2/13/19, at 10 (citation to record omitted).

Our review of the record supports the orphans' court's decision. Cristin Wormuth, an OYFS supervisor, discussed Mother's lengthy history with OYFS, which began in August 2011. N.T., 11/5/18, at 9. At that time, OYFS received a referral that one of Mother's children was hanging out of a window, followed by a report that Mother had no car seat for her infant child. *Id.* In addition to the safety concerns, Mother's home was found to be in disarray and there

- 11 -

were concerns about domestic violence between Mother and Father. *Id.* at 10. Ms. Wormuth had numerous conversations with Mother about domestic violence and her need to engage in trauma counseling to understand how domestic violence affected Mother's life and her relationships. *Id.* at 16-17. Throughout OYFS's initial involvement, Mother's progress and compliance was minimal to moderate. *Id.* at 24. Eventually, Mother agreed to voluntarily terminate her parental rights to her two older children. *Id.* at 25.

After the voluntary termination, OYFS involvement ceased. *Id.* Child was born August 2014. *Id.* OYFS became involved with Child in September 2014 when Mother left her in the care of an eight-year-old. *Id.* at 26-27. Mother insisted that the eight-year-old was "really good with the baby." *Id.* at 27. As a result of this incident, Child was adjudicated dependent. *Id.* at 28. OYFS's concerns included Mother's lack of protective capacity — in particular, Mother's failure to realize that it is inappropriate to leave an infant in the care of an eight-year-old. *Id.*

Marissa Lynady, an OYFS caseworker, testified to additional concerns regarding housing; employment; mental health treatment; and Mother's extensive history of relationships involving domestic violence. N.T., 11/19/18, at 7-8. Initially, Mother was not compliant with services, but eventually began services, albeit inconsistently. *Id.* at 6. Child was returned to Mother in March 2016, and the dependency was closed in June 2016. *Id.* at 12.

Ms. Lynady further testified that a month later, in July 2016, turmoil ensued, referencing what she perceived as Mother's gravitation to chaos. *Id.*

- 12 -

Mother reached out to Father, although she was married to R.S., and was pregnant with R.C., causing a rift in the relationship between Mother and R.S. *Id.* Eventually, R.S. left Mother. *Id.* In October 2016, Mother gave birth to R.C. *Id.* at 13. Shortly thereafter, OYFS received a report that Mother, then nearly 30, was dating a 17-year-old. *Id.* This caused OYFS concern, as Mother had two children in the home, had difficulty paying household bills, and was dating a teenager. *Id.* Mother responded that B.S. was 18 and that he was very mature for his age. *Id.* at 14.

Around this time, Mother began working more frequently and left both Child and R.C. to be supervised by B.S. *Id.* OYFS encouraged Mother to find more appropriate daycare. *Id.* Mother claimed to be attempting to locate alternate daycare. *Id.* at 15. Ms. Lynady was worried that Mother was too focused on work, was not attending therapy, and was regressing. *Id.* Ms. Lynady viewed Mother's decision to leave Child and R.C. with B.S. as a lack of "protective capacity," as she allowed someone she did not know well to be their sole caregiver ten hours a day for five or six days a week. *Id.* at 16.

In May 2017, OYFS received a new referral alleging that R.C. had a hematoma from an injury that occurred while B.S. was watching the children. *Id.* at 58-62. Erik Krauser, an intake caseworker for OYFS, testified about the report, which alleged that R.C. was brought to Moses Taylor Hospital by Mother with a black eye and a hematoma to the right scalp. *Id.* at 59. Mother claimed that she observed the injury two to three days prior, and the injury

occurred when Child threw a toy at R.C.[5] *Id.* at 59, 65, 77. It was later discovered that R.C. had two skull fractures and a rib fracture. *Id.* at 62-63. The doctors believed R.C.'s injuries were inconsistent with Mother's explanation. *Id.* at 60. Because of the inconsistency, both children were removed from Mother's care and placed in foster care on May 19, 2017. *Id.* at 61, 67-68. Further, Mr. Krauser determined that the report was indicated. *Id.* at 63. Child was adjudicated dependent on October 12, 2017.

After Child was removed from Mother's care, Jennifer Dunston, another caseworker for OYFS, became involved. The initial family service plan required mental health services; a parenting assessment; and visitation. *Id.* at 87. In November 2017, Mother's Group, a parenting program, was added to Mother's services. *Id.*

Overall, Mother had difficulty being consistent with services. *Id.* at 92. Mother's mental health counseling was scheduled for four times per month; however, Mother failed to attend in April, went twice in May, three times in June and August, and once in July, September, and October. *Id.* at 89-90. Mother was referred to Mother's Group in May 2017 and March 2018, but did not participate until May 2018. *Id.* Mother was also unsuccessfully discharged from a parenting program in August 2018. *Id.*

Further, Mother exhibited minimal progress. *Id.* at 94. Ms. Dunston testified that Mother had periods of compliance, but never made progress to

---

[5] Mother also reported that R.C.'s black eye could have been caused by Child rolling a skateboard into him. N.T., 11/19/18, at 70-71.

address the reasons why her children came into care with OYFS. *Id.* at 98. At the time OYFS filed the termination petition, Ms. Dunston assessed Mother as moderately compliant because she was engaged in Mother's Group and attended mental health counseling sporadically. *Id.* at 89. However, it was not safe to return Child to Mother because she was in a relationship with B.S. and there was no explanation for R.C.'s injuries.[6] *Id.* at 126.

Stephanie Herne, an OYFS family engagement caseworker and a visitation caseworker, testified regarding Mother's visits with Child. *Id.* at 130. Mother attended the majority of visits with B.S. *Id.* The visits started in May 2017. *Id.* at 130-31. Visits were a struggle, as Mother could not multitask with both children, often paying attention to Child and ignoring R.C. *Id.* at 131-32. The level of supervision was decreased for approximately two months before more supervised visits were reinstituted due to the birth of C.,[7] Mother's child with B.S. *Id.* at 133-34.

Mother also testified. She stated that R.C.'s injuries could have occurred when R.C. rolled off of her and struck his head on a dresser. *Id.* at 167-68. With regard to services, Mother described her attendance at mental health counseling as sporadic. *Id.* at 171-73. Further, she acknowledged that she

---

[6] Multiple case workers testified that Mother reported she was concerned that B.S. could have injured R.C. N.T., 11/19/18, at 19-20, 91.

[7] C.'s last name is not clear from the record. Accordingly, we refer to him only by his first initial.

stopped attending due to her pregnancy with C.[8]  *Id.* at 172.  Moreover,

Mother asserted the parenting group was not helpful.  *Id.* at 176-77.  When

asked by the court why she did not become more consistent with services,

particularly after having her rights voluntarily terminated to two children,

Mother responded:

> Honestly, I don't have a good enough answer for that.  It's just when it rains it pours for me.  I'm not poor, but I'm not rich.  I get by because I work hard, and I get by check to check, so when I have to take time off to do all these different things and all these different hoops, it takes a toll on my pocket, it takes a toll on my kids, it takes a toll on my finances. . . .

*Id.* at 203.

Ms. Lynady provided the following summary of Mother's parenting issues

and progress:

> Mom's always able to keep it together for a short period of time and is able to do well, and it seems [just] as things are going well, mom finds the chaos to come back in.  So, it just, it's not a long term overall effectiveness. . . .  She does what she needs for the moment in time, and then it all goes to the side at some point.  And it just, it shows that, you know, it's child after child that have been involved in our system.

*Id.* at 50.

Based on the foregoing, we discern no abuse of discretion by the

orphans' court in terminating Mother's parental rights pursuant to Section

2511(a)(2).  The evidence demonstrates that after almost a decade of OYFS

---

[8] In February 2018, shortly before C.'s birth, B.S. initiated a Protection from Abuse (PFA) action against Mother.  At the termination hearing, B.S. testified that he falsified the allegations in the PFA, acknowledging that this was a crime.  N.T., 11/19/18, at 212-13.

involvement with multiple children, Mother is either incapable or refuses to safely care for Child. Further, the evidence demonstrates that Mother's incapacity or refusal cannot or will not be remedied.

Next, we consider whether Child's needs and welfare will be met by termination pursuant to Section 2511(b). *See Z.P.*, 994 A.2d at 1121. "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Id.* The court is not required to use expert testimony, and social workers and caseworkers may offer evaluations as well. *Id.* Ultimately, the concern is the needs and welfare of a child. *Id.*

We have stated:

[b]efore granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of the relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*Z.P.*, 994 A.2d at 1121 (quoting *In re C.S.*, 761 A.2d 1197, 1202 (Pa. Super. 2000)). The trial court may equally emphasize the safety needs of the child and may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. *See In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Where there is no evidence of a bond between the

- 17 -

parent and child, it is reasonable to infer that no bond exists. *Id.* "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Mother argues that the orphans' court erred in its consideration of Section 2511(b) because the evidence revealed a strong bond between Mother and Child and there was no evidence regarding the effect that terminating Mother's parental rights would have on Child. Mother's Brief at 18-19. Accordingly, Mother contends that OYFS did not meet its burden of proof. *Id.* at 19.

In discussing Section 2511(b), the orphans' court credited testimony that a bond existed between Mother and Child. Orphans' Court Opinion, 2/13/19, at 14. However, the court also observed that Child lived with Mother for less than one month after birth, and for 10 months between the ages of two and three. *Id.* On the other hand, Child has resided with her foster family for more than three years and Child considers the foster family to be her family. *Id.* at 15. The court noted Child refers to her foster mother as her mother and is very bonded with her. *Id.* The orphans' court concluded that preserving Mother's relationship with Child "must give way to ensuring that minor child is afforded the opportunity to thrive in a loving, safe and stable home such as what the [foster family] provide[s] and Mother does not." *Id.*

Accordingly, the court found that termination best served Child's needs and welfare. *Id.*

The testimonial evidence supports the orphans' court's conclusion. Ms. Dunston testified that Child was initially placed with T.C. (Foster Mother) from September 2014 through March 2016. N.T., 11/19/18, at 85. Child returned in May 2017 and has resided in the foster home since then. *Id.* Child also lives with her brother and is doing well with the family. *Id.* at 85-86. Ms. Dunston testified that Child looks to Foster Mother to take care of her and is very bonded to her. *Id.* at 86. Ms. Herne testified that although Mother and Child are bonded, she has observed Child run to Foster Mother after visits. *Id.* at 135. Ms. Dunston opined that termination is in Child's best interest.[9] *Id.* at 125.

Upon review, we find that the orphans' court appropriately considered the bond between Child and Mother, as well as Child's need for safety and stability, in determining that termination of Mother's parental rights best met Child's needs and welfare. The record supports the orphans' court's decision, and we do not discern an error of law or abuse of discretion. Accordingly, we affirm the order involuntarily terminating Mother's parental rights.

Order affirmed.

---

[9] Mother testified she had a good relationship with Child and denied any room for improvement. N.T., 11/19/18, at 182-83, 193.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 08/30/2019